**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TAMI ATWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-01409-TWP-TAB |
| | ) | |
| INDIANAPOLIS-MARION COUNTY | ) | |
| FORENSIC SERVICES AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant, Indianapolis-Marion County Forensics Services Agency's (the "Agency"), Motion for Summary Judgment (Filing No. 55). Following termination of her employment as a forensic scientist for the Agency, Plaintiff Tami Atwell ("Ms. Atwell"), filed a complaint alleging disability discrimination in violation of the Americans with Disabilities Act of 1990 ("the ADA"). The Agency disputes that Ms. Atwell is a qualified individual with a disability and asserts that even if she does have a disability, she cannot establish that the Agency failed to reasonably accommodate her. For the following reasons, the Court **grants in part and denies in part** the Agency's Motion.

**I. BACKGROUND**

The following facts are viewed in the light most favorable to Ms. Atwell as the non-moving party. The Agency is a full service forensic laboratory accredited through the American Society of Crime Laboratory Directors/Laboratory of Accreditation Board. It employs a number of forensic scientists whose jobs involve the scientific testing and analysis of physical evidence. Items commonly tested and analyzed by the Agency include drugs, residue on drug paraphernalia, clothing and fabrics (for blood, semen, and hair), firearms, and fingerprints. The results of the

testing performed by the Agency's forensic scientists are typically used to identify or eliminate a suspect in a crime and presented as evidence in criminal court proceedings.   The forensic scientists have a high volume of work due to the number of crimes committed in Marion County, the needs of law enforcement personnel who investigate those crimes, the number of criminal prosecutions pursued by the State of Indiana, the right of criminal defendants to speedy trials, and court-imposed dates and deadlines.

The Agency is divided into several working groups, including but not limited to the Chemistry Section and the Biology Section.   The Chemistry Section includes two units, the Drug Section and the Trace Section.   The Drug Section, as its name suggests, analyzes substances suspected of being or containing a controlled substance, such as marijuana, cocaine, and heroin. The Trace Section tests items that can be thought of as everyday materials, like hair, clothing fiber, duct tape, paint, arson debris, and blood.   The Biology Section is also divided into two units, the Serology Section and the DNA Section.   The Serology Section performs tests to identify the existence of bodily fluids like blood, semen, and saliva on different pieces of evidence.   For example, the Serology Section would confirm that biological material found on a shirt is human blood.   The Serology Section would not, however, analyze the DNA in the blood to determine the identity of the person who left it.   That type of testing is done by the DNA Section.

In 1992, Ms. Atwell joined the Agency as a forensic scientist in the Trace Chemistry Section under the direct supervision of Robert McCurdy ("Mr. McCurdy").   While working in the Trace Section, Mr. McCurdy evaluated Ms. Atwell's performance on an annual basis and Ms. Atwell performed her responsibilities at a fully qualified level at all times.   (Filing No. 66-21 at 3.)   Sometime between the late 1990s and 2003, Ms. Atwell developed an allergy to marijuana.   In

response, the Agency accommodated Ms. Atwell's allergy by moving her work space multiple times and allowing her to purchase a respiration mask and use it in the chemistry laboratory.

In February 2007, Ms. Atwell was hit in the head with a basketball while volunteering for her church's youth basketball league.  On March 30, 2007, Ms. Atwell sought medical treatment from Dr. Kevin J. Puzio ("Dr. Puzio"), a neurologist.  At her first appointment, she complained of severe headaches, blurred vision, nausea, vomiting, photophobia, and increase in pain with movement.  (Filing No. 66-24 at 3.)  Dr. Puzio diagnosed Ms. Atwell with a concussion without loss of consciousness, a migraine, and post-concussive syndrome.  *Id*.  On April 27, 2007, during a follow-up appointment, Ms. Atwell reported that she was experiencing fairly severe cognitive issues, including with her speech.  *Id*.  Dr. Puzio opined that Ms. Atwell's mental impairment, which he described as a "less severe form of traumatic brain injury", substantially limited Ms. Atwell's major life activities of short term memory, speaking, concentrating, and thinking.  *Id*. at 4.)

Shortly after this appointment, Ms. Atwell applied for short-term disability leave and medical leave, which was approved.  While she was on leave, the Director of the Agency, Michael Medler ("Mr. Medler"), considered terminating Ms. Atwell's employment and he even prepared a letter informing Ms. Atwell that her employment was "concluded".  (Filing No. 66-22 at 11, 13-14.)  In addition, shortly before Ms. Atwell's leave ended, Mr. Medler called her as many as six times a day to advise Ms. Atwell that her leave was going to expire; to remind her that she could be terminated if she did not return to work; and to ask when she would be returning to work.  (Filing No. 66-22 at 13; Filing No. 66-20 at 39-41.)  Ultimately, the Agency did not send the letter to Ms. Atwell, deciding, instead, that it would take less time to re-train Ms. Atwell than to train a new hire.  (Filing No. 66-22 at 9-10, 13-14.)  Before her short-term disability leave expired, Ms.

Atwell applied for long-term disability leave.  However, Ms. Atwell's long-term disability was not approved.  After she exhausted all available paid leave, Ms. Atwell went off the Agency's payroll.

On April 8, 2008, after reviewing a copy of the job description for the forensic scientist, Dr. Puzio cleared Ms. Atwell to return to work.  As a result, Ms. Atwell returned to her previous position as a Trace Section chemist, again under the supervision of Mr. McCurdy.  Over the next two years, Mr. McCurdy assigned Ms. Atwell an overall rating of "Q," which means "performs at fully qualified level", on three annual performance appraisals.  (Filing No. 66-10; Filing No. 66-11; Filing No. 66-12.)    In addition, Ms. Atwell was credited with helping to reduce the case backlog in the Trace Section from the mid-300s to less than 30.  (Filing No. 66-11.)  While Ms. Atwell's symptoms had improved, she still had ongoing symptoms such as difficulty with her short-term memory, concentration, and focus.  (Filing No. 66-24 at 3.)

By late 2010, there was a critical backlog of cases in the Serology Section, as compared to a relatively minor backlog of cases in the Trace Section.  Specifically, the Serology Section had a backlog of 700 cases as compared to a backlog of 61 cases in the Trace Section.  Because of the backlog, Mr. Medler decided to transfer Ms. Atwell to the Serology Section to be re-trained as a Serologist, effective January 18, 2011.  Mr. Medler never asked Ms. Atwell if she wanted to be reassigned out of the Trace Section, however, he thought the transfer was a "win-win" for both Ms. Atwell and the Agency.  The Serology Section needed help and the transfer would allow Ms. Atwell to work in a building where she would not be exposed to marijuana.  (Filing No. 56-7 at 12-13, 16-18.)

Since Ms. Atwell's degree was in chemistry, and not biology, the reassignment required her to learn new material in a new area of science.  Mr. Medler was aware that Ms. Atwell had taken only two biology courses in college.  However, he believed that she was a good fit for the

4

Serology Section because of her years of experience as a forensic scientist.  (Filing No. 56-7 at 12-13, 16-18.)  Ms. Atwell had concerns about learning new material, due to her short-term memory issues.  (Filing No. 66-20 at 89-90.)  In addition, the Serology Section Supervisor, David Smith ("Mr. Smith"), anticipated that Ms. Atwell's training in serology would have to be more comprehensive as a result of her lack of experience and education in serology.  (Filing No. 66-26 at 6-7.)

Initially, there was no set timeline for Ms. Atwell to complete her training.  Within a month of her transfer, in February of 2011, Mr. Smith, who was responsible for Ms. Atwell's training, went on medical leave until April or May.  At some point thereafter, Mr. Smith also assigned another scientist to train Ms. Atwell.  However, the substitute trainer went on maternity leave, and Mr. Smith did not assign a new trainer.

As part of her training, Mr. Smith gave Ms. Atwell a significant amount of reading material, which she struggled to retain.  (Filing No. 66-20 at 43-45.)  Ms. Atwell expressed her concerns to Mr. Smith and informed him of her short-term memory issues.  (Filing No. 66-26 at 15-16, 18-19.)  She suggested to Mr. Smith that she be allowed to purchase a "smart pen," which spoke the words back to her when she took notes; Mr. Smith approved the request.  (Filing No. 66-26 at 17.)  In addition, the Agency allowed Ms. Atwell additional time to complete her training, gave her extra opportunities to observe forensic analyses by her co-workers, and provided her with specialized lectures.  (Filing No. 56-6 at 26-28.)

In March 2012, Mr. Smith emailed the Deputy Director, Ronald Blacklock ("Mr. Blacklock"), to provide him with an update on Ms. Atwell's training.  (Filing No. 66-17 at 2.)  Mr. Smith advised that Ms. Atwell's short-term memory issues "following her head injury" were causing her difficulty assimilating new analytical procedures and processes.  *Id.*  At some time

during her training, Mr. Medler also became aware that Ms. Atwell was struggling to learn new material, and it crossed his mind that her struggles may have been related to her previous head injury.  (Filing No. 66-22 at 22-23.)

On April 24, 2012, Ms. Atwell was advised that she needed to complete her training by the end of July 2012.  Mr. Smith agreed that he would spend two hours a day with Ms. Atwell to cover serological theory and practice.  However, he was not able to keep this commitment due to his other duties.  Instead, several weeks would often pass, in which Mr. Smith was not able to meet with Ms. Atwell.  In the end, Ms. Atwell's deadline to complete her training was extended until the end of August 2012 and, eventually, until the end of 2012.  (Filing No. 66-26 at 21.)  On November 7, 2012, Ms. Atwell finally completed her training.  At that time, both the Agency and Ms. Atwell felt that she was qualified to perform the work of a serologist.  (Filing No. 56-6 at 29; Filing No. 56-9 at 11.)

When Ms. Atwell was released to begin casework, Mr. Smith communicated no expectations about the volume of cases she needed to complete that year.  For her first assignment, Mr. Smith gave her a "cold case", a case which law enforcement was not actively investigating, with 43 items to be tested.  Mr. Smith did not give Ms. Atwell a deadline to complete the cold case.  He expected that it would take Ms. Atwell longer to complete the cold case than it would for an experienced analyst, and told Ms. Atwell that it should keep her busy "for a while".  (Filing No. 66-20 at 91.)

Mr. Smith thought that the cold case was a good case for Ms. Atwell to start with because there were no pressing deadlines.  (Filing No. 56-9 at 13-14.)  However, Ms. Atwell thought the cold case involved "an awful lot of testing" and noted that additional testing was required because

of the age of the items.  (Filing No. 56-6 at 30.)  In addition, the cold case required the testing of both Serology items and Trace items, which, in Ms. Atwell's view, made it more complex.

In May 2013, interim Deputy Director, Brenda Keller ("Ms. Keller"), asked Mr. Smith to investigate why Ms. Atwell had completed so few cases.  In response, Mr. Smith stated that Ms. Atwell was working on the large cold case, and that he considered Ms. Atwell to be a qualified analyst despite the fact that she was completing cases slowly.  (Filing No. 66-26 at 36-37.)

Following Ms. Atwell's work on the cold case, Mr. Smith began hand-selecting cases for her, which he believed were less complex.  (Filing No. 56-9 at 15, 21.)  However, every other forensic scientist in the Serology Section was placed on an "easy case rotation".  Ms. Atwell was not put on the rotation because Mr. Smith believed he was selecting easier cases for her.  (Filing No. 56-9 at 15, 36-37.)  During 2013, Ms. Atwell's serology cases had a higher average number of items per case than the rest of the forensic scientists in the Serology Section.  (Filing No. 56-2 at 3.)

In July 2013, Ms. Atwell had a mid-year performance review with Mr. Smith, in which she received a rating of "Q".  The Agency alleges that Mr. Smith did not feel that Ms. Atwell's work performance deserved a "Q", but contends that he was concerned that he might possibly violate the ADA if he did not give Ms. Atwell a satisfactory performance review.  (Filing No. 66-26 at 41-42.)  Ms. Keller reviewed Mr. Smith's rating and did not think that it fairly or accurately reflected Ms. Atwell's work, given Ms. Atwell's low case completion numbers.  (Filing No. 56-8 at 18-20.)  As a result, Ms. Keller decided to downgrade the mid-year performance rating to a "B," meaning Ms. Atwell's performance fell below the Agency's expectations.  *Id.*  This was the first time that Ms. Atwell had received a "B" rating in her 21 years as a forensic scientist.

Mr. Smith informed Ms. Atwell of the evaluation rating downgrade.  In response, on July 19, 2013, Ms. Atwell emailed Ms. Keller to protest the change.  On July 22, 2013, Ms. Atwell met with Ms. Keller and Mr. Smith to discuss the performance review.   Thereafter, Ms. Atwell wrote up her objection to the rating, which was attached to her mid-year evaluation.

The next day, July 23, 2013, Mr. Smith sent Ms. Atwell an email, instructing her to meet with him weekly to discuss casework and to keep a daily journal detailing cases worked, number of items, examinations performed, hours in the laboratory, and reports written.  In addition, Ms. Atwell was also required to regularly meet with Mr. Smith to discuss her progress.  Ms. Atwell did not find the log to be helpful, as it required an additional task that was not required of other serologists.  Further, she found the meetings, which were unique to her, to be stressful; and she believed that she was "being looked at closer than the other employees".  (Filing No. 56-9 at 26-28.)  As a result, the meetings made Ms. Atwell nauseous and tearful.  *Id.*

During the meetings, Mr. Smith told Ms. Atwell that her numbers were improving, and that she was progressing and doing better.  (Filing No. 66-20 at 69, 85.)  Nevertheless, by October 2013, Ms. Atwell began fearing that she was going to lose her job.  As a result, Ms. Atwell discussed with Mr. Smith about the possibility of working on more Trace cases to increase the number of cases completed.  (Filing No. 66-20 at 57.)  On October 16, 2013, Ms. Atwell emailed Mr. McCurdy to ask whether she could work on more cases in the Trace Section, such as blood alcohol or fire debris cases.  (Filing No. 66-7 at 2.)  Mr. McCurdy took the email to Ms. Keller, who determined that there was no way to assist Ms. Atwell.  (Filing No. 66-21 at 3.)  Mr. McCurdy also forwarded the email to Mr. Medler, who interpreted Ms. Atwell's request as "trying to dictate" where she wanted to work and what kind of cases she would do and, therefore, did not consider Ms. Atwell's request.  (Filing No. 66-22 at 25-28.)

8

On October 29, 2013, Ms. Atwell approached Ms. Keller to express her difficulties concentrating on cases involving a large number of items and to request accommodations to improve her productivity.  (Filing No. 66-23 at 29-30.)  To accommodate her issues, Ms. Atwell requested to move back to the Trace Section to work on blood alcohol and fire debris testing. (Filing No. 66-23 at 29-30.)  Ms. Atwell believed that a move back to the Trace Section would improve her case numbers.  Alternatively, Ms. Atwell suggested that she would be more productive if she could work on smaller cases with fewer items in the Serology Section.  (Filing No. 66-20 at 87.)  Ms. Atwell wanted to be where she was most valuable to the Agency, and explained that she hoped her honesty would not cause her to lose her job.  (Filing No. 66-23 at 32-33.)  Ms. Keller recalled Ms. Atwell saying "that she wanted to be where she was most productive in the laboratory" and that "[s]he knew that since she had her head injury she was not performing cases to the potential that she was prior to that injury."  (Filing No. 66-23 at 29-30.)

After Ms. Atwell made her request, Ms. Keller concluded that Ms. Atwell could not work anywhere in the laboratory.  (Filing No. 66-23 at 34-35.)  Ms. Keller considered Ms. Atwell's accommodation requests as an admission that she could not do her job.  (Filing No. 60 at 15; Filing No. 66-23 at 34-35; Filing No. 56-2 at 4.)  Specifically, Ms. Keller believed Ms. Atwell was requesting "rote performance of simple tasks requiring little to no critical thinking or mental analysis."  (Filing No. 60 at 15.)  Further, Ms. Keller considered Ms. Atwell's difficulties concentrating and focusing might jeopardize the accuracy of her test results.  (Filing No. 60 at 15.)

Ms. Keller shared her concerns with Mr. Medler. Thereafter, Mr. Medler discussed the matter with Ms. Keller, Human Resources personnel, Juli Paini ("Ms. Paini") and Jeani Nolte, and legal counsel for Indianapolis-Marion County Government.  Mr. Medler decided that the Agency "had gone to great lengths . . . to help [Ms.] Atwell succeed as a [s]erologist both before and after

her training period, had exhausted all reasonable options to accommodate … her . . . claimed mental impairments, and there was nothing more it could do to retain [Ms.] Atwell as an employee." (Filing No. 60 at 16; Filing No. 56-1 at 6.)  Mr. Medler also considered Ms. Atwell's request for an accommodation to be an admission that she could not be productive as a forensic scientist in the Serology Section.  (Filing No. 60 at 17; Filing No. 56-1 at 7.)  As a result, Mr. Medler did not consider any options that would allow Ms. Atwell to continue to work for the Agency as a forensic scientist, deciding, instead, that Ms. Atwell's only options were termination, applying for long-term disability, resigning, or applying for open positions with Indianapolis-Marion County Government.  (Filing No. 66-22 at 30-33.)

On November 22, 2013, Ms. Atwell met with Ms. Paini and Liz Terry ("Ms. Terry") from the Indianapolis-Marion County's Human Resources Department.  Ms. Atwell hoped that the meeting was to address her requested accommodations.  She was told that her employment was being terminated.  At the meeting, Ms. Atwell suggested that the Agency transfer a Trace Section scientist to the Drug Section so that she could transfer to the Trace Section rather than be terminated.  (Filing No. 66-20 at 73-74.)

On November 26, 2013, Ms. Atwell met with Ms. Paini and Ms. Terry a second time, and Ms. Atwell was again informed that she must resign or be terminated.  However, Ms. Paini and Ms. Terry explained that Ms. Atwell's formal separation date would be delayed until December 2, 2013, to allow Ms. Atwell to maintain her benefits for another pay period, to apply for other open positions within Indianapolis-Marion County government, and to apply for long-term disability benefits.  Ms. Paini told Ms. Atwell that the Agency had been looking at Ms. Atwell more closely because of her "disability stuff" and they wanted to give her time to file for disability benefits. (Filing No. 66-20 at 77.)  On December 9, 2013, the Agency terminated Ms. Atwell's employment.

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court reviews the record in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (noting that, when the non-movant has the burden of proof on a substantive issue, specific forms of evidence are not required to negate a non-movant's claims in the movant's summary judgment motion, and that a court may grant such a motion, "so long as whatever is before the district court demonstrates that the standard . . . is satisfied.").  *See also* Fed. R. Civ. P. 56(c)(1)(A) (noting additional forms of evidence used in support or defense of a summary judgment motion, including: "depositions, documents electronically stored information, affidavits or declarations, stipulations  .  .  . , admissions, interrogatory answers, or other materials").

Thereafter, a nonmoving party, who bears the burden of proof on a substantive issue, may not rest on its pleadings but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial.  *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Celotex Corp.*, 477 U.S. at 323-24; Fed. R. Civ. P. 56(c)(1).  Neither the mere existence of some alleged factual dispute between the parties nor the existence

of some "metaphysical doubt" as to the material facts is sufficient to defeat a motion for summary judgment. *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997); *Anderson*, 477 U.S. at 247-48; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

Similarly, a court is not permitted to conduct a paper trial on the merits of a claim and may not use summary judgment as a vehicle for resolving factual disputes. *Ritchie v. Glidden Co., ICI Paints World-Grp.*, 242 F.3d 713, 723 (7th Cir. 2001); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth*, 476 F.3d at 490. When ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id.*

## III. DISCUSSION

The ADA prohibits employers from discriminating against a "qualified individual on the basis of disability". 42 U.S.C. § 12112(a) (2012). Ms. Atwell alleges three different claims of discrimination under the ADA. First, Ms. Atwell argues that the Agency failed to provide a reasonable accommodation for her disability. Second, she asserts that it discriminated against her because of her disability. Third, she contends that it retaliated against her for requesting a reasonable accommodation. The Court will address each in turn.

A.    **Disability**

To establish both her reasonable accommodation and disability discrimination claims, Ms. Atwell must first prove that she had a disability, as defined by the relevant statutes.  *DePaoli v. Abbott Labs.*, 140 F.3d 668, 672 (7th Cir. 1998) (noting that it is a plaintiff's burden to demonstrate that she has an ADA recognized disability).  In order to demonstrate a disability, a plaintiff must show: (1) that she has a physical or mental impairment that substantially limits her in one or more major life activities; (2) that she has a record of such an impairment; or (3) that the employer regarded her as having such an impairment[1].  42 U.S.C. § 12102(1).  The evaluation of whether a plaintiff has a disability is "an individualized one, and must be determined on a case-by-case basis."  *DePaoli*, 140 F.3d at 672.  Further, "the definition of disability . . . shall be construed in favor of broad coverage of individuals."  42 U.S.C. § 12102(4)(A).  Ms. Atwell has submitted sufficient evidence to establish a disability under all three prongs.

1.    **Impairment that Substantially Limits Major Life Activities**

Ms. Atwell can factually establish a disability under the first prong.  In order to show a disability under the first prong, the court must: evaluate whether the plaintiff's condition constitutes an impairment under the ADA, determine whether any major life activities are affected by the impairment, and assess whether the impairment substantially limits the performance of those major life activities.  *E.E.O.C. v. Sears, Roebuck & Co.* (*Sears*), 417 F.3d 789, 797-98 (7th Cir. 2005); *Knox v. Snider*, No. 1:11-cv-00949-TWP-TAB, 2012 WL 5929963, at *6 (S.D. Ind. Nov. 27, 2012) (J. Pratt).  "Major life activities" include, but are not limited to: caring for oneself,

---

[1] Under the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), a plaintiff can establish a disability under the "regarded as" prong for a disability discrimination claim, but a plaintiff cannot establish a disability under the "regarded as" prong for a reasonable accommodation claim.  *See* Sectioned States Equal Employment Opportunity Commission, *Fact Sheet on the EEOC's Final Regulations Implementing the ADAAA*, http://www.eeoc.gov/laws/regulations/adaaa_fact_sheet.cfm (last visited Mar. 1, 2016).

performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i) (additionally including sitting, reaching, and interacting with others).

However, "[n]ot every medical affliction amounts to, or gives rise to, a substantial limitation on a major life activity." *Cassimy v. Bd. of Educ. of the Rockford Pub. Schs., Dist. No. 205*, 461 F.3d 932, 936 (7th Cir. 2006); *Sinkler v. Midwest Property Mgmt. Ltd. P'ship*, 209 F.3d 678, 685 (7th Cir. 2000) ("the impairment must substantially limit employment generally"). Instead, the impairment must substantially limit the ability of an individual to perform a major life activity "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). *But see* 29 C.F.R. § 1630.2(j)(1)(i) ("the term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard").

The Agency argues that Ms. Atwell's diagnosis of post-concussive syndrome by itself is insufficient to satisfy the ADA. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 607 (7th Cir. 2012) (noting that a plaintiff "cannot rely on the name of diagnosis of the impairment" but "must show the effect of the impairment on [her]"). However, Ms. Atwell has done more than merely present a diagnosis. She has also put forth the opinion of her treating neurologist, Dr. Puzio, who stated that Ms. Atwell's mental impairment substantially limited her major life activities of short-term memory, speaking, concentrating, and thinking. (Filing No. 66-24 at 4.)

Although the Agency additionally notes the results of Ms. Atwell's neurological testing in 2007 and 2013, which did not reveal post-concussive neurocognitive difficulty, the most this evidence does is establish a genuine issue of material fact regarding the limiting effects of Ms.

Atwell's impairment.  This is particularly true, given that Dr. Puzio appears to have been aware of the neurological test results when he created his opinion.  (Filing No. 66-24 at 2-3.)  As a result, viewing the evidence in light most favorable to Ms. Atwell, a reasonable jury could conclude that Ms. Atwell was substantially limited in the major life activities of short-term memory, speaking, concentrating, and thinking.

### 2.  Record of an Impairment

In addition, Ms. Atwell can factually establish a disability under the second prong.  In order to have a record of disability, a plaintiff must show she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1).  "This inquiry is fact intensive and focuses on whether the plaintiff has submitted evidence that the actual extent of his or her impairment was substantial." *Knox*, 2012 WL 5929963, at *6.

In this regard, the record is replete with evidence of Ms. Atwell being classified as having substantial limitations in the major life activities of short-term memory, speaking, concentrating, and thinking.  In addition to Dr. Puzio's opinion, Ms. Atwell applied for, and the Agency, approved short-term disability leave and medical leave because of her post-concussive symptoms.  Further, after her return from medical leave and until her termination, Ms. Atwell openly and regularly communicated her problems with focus and concentration.  Similarly, the Agency regularly acknowledged Ms. Atwell's ongoing difficulties in both its communications with Ms. Atwell and in private among Ms. Atwell's supervisors.  Further, Ms. Atwell's Serology Section supervisor, Mr. Smith was well aware of Ms. Atwell's cognitive limitations during her training as a serologist and made numerous attempts to assist Ms. Atwell to learn the new position despite her limitations.

These facts are more than sufficient for Ms. Atwell to demonstrate that she had a record of having a mental impairment that substantially limited several major life activities.

### 3. <u>Regarded as Having an Impairment</u>

Finally, Ms. Atwell can also factually establish a disability under the third prong. A plaintiff meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A); 29 C.F.R. 1640.2(l). In particular, a plaintiff must establish either that the employer mistakenly believed that she had an impairment that substantially limits a major life activity, or that the employer mistakenly believed that an existing impairment, which is not actually limiting, does substantially limit a major life activity. *Fleishman*, 698 F.3d at 607. *But see* Sectioned States Equal Employment Opportunity Commission, *Fact Sheet on the EEOC's Final Regulations Implementing the ADAAA*, http://www.eeoc.gov/laws/regulations/adaaa_fact_sheet.cfm (last visited Mar. 1, 2016) ("[u]nder the ADAAA, the focus for establishing coverage is on how a person has been treated because of a physical or mental impairment . . . rather than on what an employer may have believed about the nature of the person's impairment.").

The same facts which potentially establish that Ms. Atwell had a record of substantial limitations in several major life activities also potentially establish that the Agency regarded Ms. Atwell has having such limitations. Indeed, the Agency cannot credibly argue that it did not regard Ms. Atwell as having substantial limitations in her ability to focus and concentrate, when the Agency unequivocally asserts that it decided to terminate Ms. Atwell's employment as a forensic

scientist because of those same limitations.  (*See, e.g.*, Filing No. 56-1 at 7; Filing No. 56-2 at 4; Filing No. 60 at 15, 17; Filing No. 66-23 at 34-35.)

Accordingly, Ms. Atwell has submitted sufficient evidence to establish that she has a physical or mental impairment that substantially limits her in one or more major life activities; that she has a record of such an impairment; and that the Agency regarded her as having such an impairment.  Consequently, Ms. Atwell can factually establish that she had a disability, as defined by the ADA.

**B.     Reasonable Accommodation Claim**

Ms. Atwell's first claim is that the Agency failed to provide a reasonable accommodation for her disability.  The ADA defines discrimination, in part, as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business".  42 U.S.C. § 12112(b)(5)(A). To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability.  *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015); *Sears*, 417 F.3d 789, 797 (7th Cir. 2005).

Ms. Atwell claims that the Agency failed to engage in the required interactive process and decided to terminate her employment after she requested an accommodation.  The Agency responds that Ms. Atwell is not a qualified individual with a disability and that the Agency was not required to accommodate Ms. Atwell's alleged disability.  As already discussed, Ms. Atwell has demonstrated sufficient facts for a reasonable jury to conclude that she has a physical or mental

impairment that substantially limits her in one or more major life activities or that she has a record of such an impairment.

## 1.   <u>Qualified Individual with a Disability</u>

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires". 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(m). It is the plaintiff's burden to establish that she is a qualified individual. *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 911 (7th Cir. 1996).

To determine whether someone is a "qualified individual", a plaintiff must satisfy a two-step test. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015). First, the plaintiff must establish that she satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc. *Id*. In this case, the parties do not dispute that Ms. Atwell satisfied the prerequisites for the position of a forensic scientist based on her education and twenty years of experience. (Filing No. 65 at 22.)

Second, the plaintiff must establish that she can perform the essential functions of the position held or desired, *with or without* reasonable accommodation." *Stern*, 788 F.3d at 285 (emphasis added). To determine the essential functions of the employee's position, courts consider such factors as "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Cirs.*, 601 F.3d 674, 679 (7th Cir. 2010); *see also* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3). In particular, courts give deference to an employer's judgment regarding which requirements of a particular job are "essential". 42 U.S.C. § 12111(8); *Gratzl*, 601 F.3d at 679

("[w]e presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary"); *DePaoli*, 140 F.3d at 674 ("[a]lthough we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job.").

However, what the employer argues to be an essential function of the job is not conclusive, and courts may look to other factors to determine whether the employer has established whether the task at issue is essential to the job in question. *Brown v. Smith*, 21 F. Supp. 3d 974, 980 (S.D. Ind. 2014) (J. Pratt); *Stern*, 788 F.3d at 285-86 ("the employer's judgment is an important factor, but it is not controlling. . . . [courts] also look to evidence of the employer's actual practices in the workplace"); 29 C.F.R. pt. 1630, app. ("[w]hether a particular function is essential is a factual determination that must be made on a case by case basis.  In determining whether or not a particular function is essential, all relevant evidence should be considered.").

To begin, Ms. Atwell argues that she was capable of meeting the essential functions of a forensic scientist in the Trace Section.  However, Ms. Atwell was not employed in the Trace Section when she asked for a reasonable accommodation and was terminated.  Instead, Ms. Atwell was transferred to the Serology Section nearly three years before either event took place.  *See Gratzl*, 601 F.3d at 680 ("an employer is not required to maintain an existing position or structure that, for legitimate reasons, [the employer] no longer believes is appropriate.").  As such, the essential functions of a forensic scientist in the Trace Section are not relevant.  Because the determination as to whether an individual is a "qualified individual" must be made at the time of the employment decision, the relevant inquiry is whether Ms. Atwell was capable of meeting the essential functions of a forensic scientist in the Serology Section.  *See* 29 C.F.R. pt. 1630, app.;

*Gratzl*, 601 F.3d at 680 (noting that a plaintiff cannot show that she is qualified for her current job by citing evidence that she was qualified for a previous job, with different essential functions, that has been eliminated).

The Agency begins by identifying the following "essential functions" of a forensic scientist: the ability to provide a wide variety of complex scientific analysis on criminal evidence; the ability to prioritize complicated cases with multiple items of physical evidence; the ability to multitask; and the ability to apply critical thinking techniques. (Filing No. 56-3 at 2; Filing No. 56-4 at 2.) Ms. Atwell does not appear to challenge these functions as non-essential. The parties appear locked in a factual dispute regarding whether a specific pace of work was an essential function of a forensic scientist position in the Serology Section. (*Compare* Filing No. 56-1 at 3; Filing No. 56-8 at 18-20 *with* Filing No. 56-6 at 26-28; Filing No. 56-9 at 13-14; Filing No. 66-20 at 91; Filing No. 66-26 at 16, 21, 31-32.)

Ms. Atwell does not dispute that she was struggling to meet at least some of the essential functions of her position at the time she requested an accommodation and was terminated. In particular, she admits that she was having difficulty with her short-term memory, concentrating on cases involving a large number of items, and maintaining her productivity. (Filing No. 66-23 at 29-30; Filing No. 66-26 at 15-16, 18-19.) Indeed, it was these struggles that motivated Ms. Atwell to request accommodations in the first place. (Filing No. 66-23 at 29-30, 32-33.)

The Agency would like the Court to believe that this admission is fatal to Ms. Atwell's reasonable accommodation claim. However, while Ms. Atwell may be unable to demonstrate that she could perform her position in the Serology Section *without* an accommodation[2], it does not

---

[2] Because factual issues exist regarding whether a particular pace was an essential function of the job of a forensic scientist in the Serology Section, the Court makes no conclusion as to whether a particular pace was an essential function; nor does the Court make a conclusion as to whether Ms. Atwell was capable of meeting that function with or without a reasonable accommodation.

end the analysis.  The Court must also consider whether the employee could perform the essential functions of her position *with* an accommodation.  *See, e.g.*, *Stern*, 788 F.3d at 288; *Jackson v. City of Chi.*, 414 F.3d 806, 812-13 (7th Cir. 2005); *DePaoli*, 140 F.3d at 674.  Notably, in this regard, Agency does not offer any argument.

A reasonable accommodation is defined as "[m]odifications or adjustments to the work environment, or to the manner of circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position."  20 C.F.R. § 1630.2(o)(1)(ii).  Examples of potential reasonable accommodations include: "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, or similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9)(B); 20 C.F.R. § 1630.2(o)(2)(ii) (additionally including: "appropriate adjustment or modifications of examinations, training materials, or policies" and "the provision of qualified readers or interpreters").  However, an accommodation may not impose an undue hardship on an employer.  *Dey v. Milwaukee Forge*, 957 F. Supp. 1043, 1052 (E.D. Wis. 1996).

On October 29, 2013, Ms. Atwell approached Ms. Keller to express her difficulties concentrating on cases involving a large number of items and to request accommodations to improve her productivity.  (Filing No. 66-23 at 29-30.)  To accommodate her issues, Ms. Atwell requested to move back to the Trace Section to work on blood alcohol and fire debris testing.  (Filing No. 66-23 at 29-30.)  Alternatively, Ms. Atwell suggested that she would be more productive if she could work on smaller cases with fewer items in the Serology Section.  (Filing No. 66-20 at 87.)  To complete its analysis regarding the issue of "qualified individual", the Court

must evaluate whether either accommodation would have enabled Ms. Atwell to perform the essential functions of her position and whether those requests were reasonable.

### a.      Transfer to Trace Department

First, Ms. Atwell requested that she be permitted to transfer to a position in the Trace Section. (Filing No. 66-23 at 29-30.) Alternatively, Ms. Atwell suggested that the Agency temporarily transfer a Trace Section scientist to the Drug Unit so that she could transfer to the Trace Section instead of being terminated. (Filing No. 66-20 at 73-74.) Reassignment to a vacant position for which the disabled plaintiff is otherwise qualified with or without an accommodation is a reasonable accommodation under the ADA. *See* 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2)(ii); *Gile v. Sectioned Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir. 2000). However, it is the plaintiff's burden to show that a vacant position exists. *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001). In addition, the ADA regulations make clear that the plaintiff "must be qualified for, and be able to perform the essential functions of, the position sought with or without reasonable accommodation." 29 C.F.R. pt. 1630. app.; *Ozlowski*, 237 F.3d at 840; *Gile*, 213 F.3d at 374.

Ms. Atwell offers no evidence that she knew of any vacant positions in the Trace Section at the time she made her accommodation request. As a result, Ms. Atwell cannot establish that her request to transfer was a reasonable accommodation request. *See Ozlowski*, 237 F.3d at 840. In addition, Ms. Atwell's request that the Agency transfer another Trace Section employee to another position to accommodate her transfer to the Trace Section is similarly not reasonable. The ADA does not require an employer to either create a new position or "bump" another employee in order to create a vacancy for the disabled employee. *Gile*, 213 F.3d at 374; *Jackson*, 414 F.3d at 812-13. Nor does the ADA require an employer to transfer the disabled employee to a temporary

22

position on a more permanent basis. *Gratzl*, 601 F.3d at 681; *Ozlowski*, 237 F.3d at 842. Consequently, the Court need not consider Ms. Atwell's transfer request any further.

### b.   "Easier" Serology Caseload

Second, Ms. Atwell requested that she be allowed to work on smaller cases with fewer items in the Serology Section. (Filing No. 66-20 at 87.) Whether this requested accommodation would have enabled Ms. Atwell to perform the essential functions of her job and whether the accommodation was reasonable appear to be dependent upon factual issues that the Court cannot resolve.

For instance, the Agency argues that Ms. Atwell's request for an "easier" caseload would have stripped the position of its essential functions and would have unduly burdened other serologists. (Filing No. 60 at 26-27, 29.) *See Dey*, 957 F. Supp. at 1052. ("[a]n accommodation that would result in other employees having to work harder or longer is not required under the ADA."). In response, Ms. Atwell points out that every forensic scientist in the Serology Section, except her, was placed on an "easy case rotation". (Filing No. 56-9 at 15, 36-37.) Instead of being placed on this already-existing, "easier" rotation, Ms. Atwell's supervisor, Mr. Smith, hand-selected the cases which he thought were the easiest for Ms. Atwell to work on. *Id.* Ms. Atwell has submitted evidence that, at least in 2013, these hand-selected, "easier" cases had a higher average number of items per case than the rest of the forensic scientists in the Serology Section. (Filing No. 56-2 at 3.)

Further, Ms. Atwell points out that, during the first three years after returning from medical leave, she was able to maintain productivity while working on "easier" Trace cases and was even credited with reducing a significant backlog of cases, despite her ongoing limitations. (Filing No. 66-10; Filing No. 66-11; Filing No. 66-12; Filing No. 66-24 at 3.) While potentially not well

communicated, Ms. Atwell's accommodation request could be construed as requesting a similar-type caseload in serology.[3]  (Filing No. 66-20 at 87; Filing No. 66-23 at 29-30; Filing No. 66-26 at 48.)

While it is true that an employer need not strip a current job of its principal duties or reassign an employee to a permanent light duty position, *Gratzl*, 601 F.3d at 680, the Court cannot conclude with certainty that Ms. Atwell's requested accommodation for a less-complex serology caseload would have imposed such a burden on the Agency.  Indeed, Ms. Atwell has submitted evidence that such an accommodation was potentially feasible and may have already existed.  In addition, viewing the facts in a light most favorable to Ms. Atwell, a factual issue exists regarding whether Ms. Atwell could perform the essential functions of a forensic scientist in the Serology Section with the requested accommodation, particularly given her success with a less complex caseload in the Trace Section.  Accordingly, Ms. Atwell can factually establish that she is a qualified individual with a disability.

## 2.    Failure to Reasonably Accommodate

In addition, Ms. Atwell can also demonstrate that the Agency failed to reasonably accommodate her.  When a disabled employee is not able to perform the essential functions of a particular job without an accommodation, the ADA requires that the employer and disabled employee engage in a "flexible, interactive process" so that, together, they might identify the employee's precise limitations and determine what reasonable accommodation would enable the

---

[3] Impacting the Court's analysis is this regard is the Agency's complete failure to engage the interactive process regarding this requested accommodation.  Because the interactive process is specifically designed to assist the parties, who begin the process with poor information, with identifying appropriate accommodations, and because the Agency did not even entertain the interactive process, a factual issue exists whether Ms. Atwell's request for a less complex serology caseload was, in fact, reasonable.  *See Miller v. Ill. Dep't of Corrs.*, 107 F.3d 483, 486 (7th Cir. 1997) ("[t]he employer will often know more about the feasibility of [requested accommodations] than the employee, so if an employee requests accommodation the employer must make a reasonable effort to explore the possibilities"); 29 C.F.R. pt. 1630, app.  *See also* Section III.B.2, *infra*.

employee to continue working. *Sears*, 417 F.3d at 805; *Gile*, 213 F.3d at 373. The relevant

regulations explain the purpose of the interactive process as follows.

> [I]n some instances neither the individual requesting the accommodation nor the
> employer can readily identify the appropriate accommodation. For example, the
> individual needing the accommodation may not know enough about the equipment
> used by the employer or the exact nature of the work site to suggest an appropriate
> accommodation. Likewise, the employer may not know enough about the
> individual's disability or the limitations that disability would impose on the
> performance of the job to suggest an appropriate accommodation.

29 C.F.R. pt. 1630, app.

To trigger the interactive process, the employee must indicate to the employer that she has

a disability and that she desires an accommodation. *Sears*, 417 F.3d at 803-04; *Gile*, 213 F.3d at

373. Thereafter, the employer must engage in the interactive process with the employee. *Sears*,

417 F.3d at 805-07 ("[a]n employer cannot sit behind a closed door and reject the employee's

requests for accommodation without explaining why the requests have been rejected or offering

alternatives"); *Gile*, 213 F.3d at 373 (holding that an employer has "an affirmative obligation" to

"seek [the employee] out and work with her to craft a reasonable accommodation"); 29 C.F.R. §

1630.2(o)(3).

Once a disabled employee requests an accommodation, "the employer may not simply

reject [the employee's request] without offering other suggestions or at least expressing a

willingness to continue discussing possible accommodations." *Sears*, 417 F.3d at 806-07 (adding

that the employer must also explain its reasons for rejecting the employee's requests); *see also*

*Miller v. Ill. Dep't of Corrs.*, 107 F.3d 483, 486 (7th Cir. 1997) ("[t]he employer will often know

more about the feasibility of [requested accommodations] than the employee, so if an employee

requests accommodation the employer must make a reasonable effort to explore the possibilities");

29 C.F.R. pt. 1630, app. ("the employer must make a reasonable effort to determine the appropriate

accommodation"). "This reflects the give-and-take aspect of the interactive process." *Sears*, 417 F.3d at 806.

Nevertheless, failure of the interactive process is not an independent basis for liability under the ADA, if the employer can show that no reasonable accommodation was possible. *Sears*, 417 F.3d at 805; *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1059 n.1, 1062 (7th Cir. 2014) ("[failure to engage the interactive process] is actionable if it prevents identification of an appropriate accommodation for a qualified individual"); *Stern*, 788 F.3d at 292. Indeed, "even if an employer fails to engage in the required process, that failure need not be considered if the employee fails to present sufficient evidence to show that she was able to perform the essential functions of her job with an accommodation." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013); *Stern*, 788 F.3d at 292. In this regard, the employee must show, through "non-speculative evidence" that a reasonable accommodation could be made that would enable her to carry out the essential functions of her job. *Stern*, 788 F.3d at 293, 295 (noting, for example, that a plaintiff could show that he performed a comparable job after his termination and performed the job's essential functions); *Spurling*, 739 F.3d at 1062.

As previously discussed, Ms. Atwell requested a potentially reasonable accommodation, when she requested a less complex caseload in the Serology Section. By its own admission, the Agency made no response, whatsoever, in regards to the feasibility or reasonableness of this request. By its own admission, the Agency interpreted Ms. Atwell's request for a less complex caseload as an admission that she could not perform the essential functions of her job and decided to terminate her employment without any further discussion. (Filing No. 56-1 at 6-7; Filing No. 56-2 at 4; Filing No. 60 at 15-17; Filing No. 66-22 at 30-33; Filing No. 66-23 at 34-35.)

The Seventh Circuit has repeatedly held that no response from the employer is insufficient to demonstrate an employer's active participation in the interactive process. *See, e.g.*, *Brown*, 21 F. Supp. 3d at 982 (holding that an employer did not engage in the interactive process when it decided to withdraw an existing accommodation rather than attempting to work with the employee to adjust the accommodation); *Sears*, 417 F.3d at 806-08 (holding that an employer did not meaningfully participate in the interactive process when it merely denied the employee's request rather than suggesting possible accommodations or requesting additional information to determine possible accommodations); *Gile*, 213 F.3d at 373-74 (holding that the employer "flunked its obligations" by not engaging the employee and, instead, telling the employee to "just resign or stay home"); *Miller*, 107 F.3d at 486-87 ("even if an employee . . . just says to the employer, 'I want to keep working for you-do you have any suggestions?' the employer has a duty under the Act to ascertain whether he has some job that the employee might be able to fill."). As such, it is without question that Ms. Atwell can factually demonstrate this element of her claim.

 The Agency asserts that it did not believe it was required to engage in the interactive process because it had previously accommodated Ms. Atwell's marijuana allergy when she worked in the Trace Section and had previously accommodated Ms. Atwell's mental impairment during her training as a serologist. (Filing No. 60 at 16; Filing No. 56-1 at 6.) Specifically, the Agency notes that it had previously accommodated Ms. Atwell's marijuana allergy from 2003-2006, moving Ms. Atwell's work space multiple times and allowing Ms. Atwell to purchase a respiration mask to use in the laboratory. In addition, the Agency notes that it had provided significant accommodations to assist Ms. Atwell during her serology training from 2011-2012, including allowing her additional time to complete her training, giving her extra opportunities to observe forensic analyses by her co-workers, and providing her with specialized lectures. (Filing No. 56-

6 at 26-28.).   Accordingly, when Ms. Atwell made her formal request for accommodation to improve her productivity in the Serology Section, Mr. Medler and the Agency decided that it "had exhausted all reasonable options to accommodate her . . . claimed mental impairments, and there was nothing more it could do to retain [Ms.] Atwell as an employee." (Filing No. 60 at 16; Filing No. 56-1 at 6.)

The Agency did take significant steps to accommodate Ms. Atwell's marijuana allergy and to train Ms. Atwell as a serologist.  However, on October 29, 2013, Ms. Atwell did not request additional accommodations for her marijuana allergy, which appears to have resolved either before her brain injury or shortly after her transfer to the Serology Section.  Nor did Ms. Atwell request additional accommodations for her training as a serologist.  Indeed, both Ms. Atwell and the Agency admit that, as of November 7, 2012, she had completed her serology training and was fully qualified to perform the work of a serologist. (Filing No. 56-6 at 29; Filing No. 56-9 at 11.)

When Ms. Atwell made her request for an accommodation nearly a year after her serology training was complete, the parties agree that she was looking for ways to improve her productivity as a serologist, noting "[s]he knew that since she had her head injury she was not performing cases to the potential that she was prior to that injury." (Filing No. 66-23 at 29-30.)  While Ms. Atwell's limitations may have stemmed from the same brain injury that required accommodations during her serology training, the limitations Ms. Atwell identified on October 29, 2013 were not substantively addressed by the prior accommodations of a smart pen, specialized lectures, and additional observations of co-workers.

Mr. Medler and the Agency may have grown weary of accommodating Ms. Atwell's evolving limitations related to her brain injury, but their weariness did not excuse the Agency's legal duty to at least minimally engage in the interactive process when faced with Ms. Atwell's

legitimate and newly-articulated limitations and her potentially reasonable accommodation request. Just as Ms. Atwell is required to establish that she was capable of meeting the essential functions of a forensic scientist in the Serology Section at the time of her requested accommodation and termination, the Agency must also demonstrate that it engaged in the interactive process at the time Ms. Atwell actually requested the accommodation. Notably, the Agency offers no legal authority to contradict this conclusion, and neither does the Court.

Finally, to the extent that the Agency also argues that it was already accommodating Ms. Atwell's productivity concerns by requiring her to log her work and meet weekly with Mr. Smith, the Court notes that there is a factual dispute regarding whether these requirements were properly considered accommodations. While the Agency may have viewed these requirements as efforts to assist Ms. Atwell, Ms. Atwell perceived them as adding additional work duties and as tools to further scrutinize her work. (Filing No. 56-9 at 22-23, 26-28; Filing No. 66-20 at 55-56, 69-71.) Indeed, these requirements might have actually decreased Ms. Atwell's productivity, given that the parties agree that the meetings made Ms. Atwell stressed, nauseous, and tearful. (Filing No. 56-9 at 26-28.)

In the end, the Court cannot ignore the fact that the Agency made no response, whatsoever, in regards to the feasibility or reasonableness of Ms. Atwell's request for a less complex Serology caseload. As such, Ms. Atwell can factually demonstrate that the Agency failed to accommodate her limitations by failing to engage in the interactive process. As a result, viewing the facts in a light most favorable to Ms. Atwell, the Court concludes that Ms. Atwell can factually demonstrate that she was a qualified individual with a disability and that the Agency failed to reasonably accommodate her known disability, sufficient to maintain a viable reasonable accommodation claim.

C.    **Discrimination Claim**

Ms. Atwell's second claim is that the Agency discriminated against her because of her disability.  The ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a).  In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: (1) that she suffers from a disability as defined in the statutes; (2) that she is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that she has suffered an adverse employment action as a result of her disability.  *Jackson*, 414 F.3d at 810; *Martinez v. Ind. Univ. Health, Inc.*, No. 1:12-CV-567-TWP, 2013 WL 5775082, at *4 (S.D. Ind. Oct. 25, 2013) (J. Pratt).

As already discussed, Ms. Atwell has demonstrated sufficient facts for a reasonable jury to conclude that she has a disability under all three prongs of the ADA definition.  In addition, the Agency does not dispute that Ms. Atwell's termination was an adverse employment action.  As a result, the Court need only consider whether Ms. Atwell can also factually demonstrate that the Agency discriminated against her because of her disability.

As with other federal anti-discrimination statutes, an ADA plaintiff may prove disability discrimination by presenting direct evidence of discrimination, or she may prove discrimination indirectly using the *McDonnell Douglas* burden-shifting method.  *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  Ms. Atwell asserts a discrimination claim solely under the direct method, identifying circumstantial evidence to demonstrate a potentially discriminatory motive.

30

Under the direct method, a plaintiff can present either direct evidence of discrimination, such as an admission by the decision maker that his or her actions were based upon discriminatory animus, or circumstantial evidence that would allow a jury to infer intentional discrimination. *Dickerson*, 657 F.3d at 601; *see also Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 660 (7th Cir. 2013) ("[a] party may combine . . . various types of evidence to present a 'convincing mosaic of circumstantial evidence' from which a factfinder can make a reasonable inference of discriminatory intent.").   The type of circumstantial evidence that a plaintiff may produce to survive summary judgment includes: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action. *Dickerson*, 657 F.3d at 601.

In support of her claim, Ms. Atwell minimally notes Ms. Paini's comment that the Agency had been looking at Ms. Atwell more closely because of her "disability stuff", which Ms. Atwell claims was made at the time Ms. Paini notified her of her pending termination.[4]   ([Filing No. 66-20 at 77](#).)   In addition, Ms. Atwell notes that the Agency required her to keep a record of her work and meet weekly with her supervisor to assess her work.   Ms. Atwell suggests that, when considered together, these facts suggest a discriminatory motive for her termination.   However, in making this argument Ms. Atwell relies solely on her subjective belief regarding the intent of Ms. Paini's comment and the requirements imposed upon her, an assumption that is insufficient to create a genuine issue of material fact.   *See Mills v. First Fed. Sav. & Loan Assoc. of Belvidere*,

---

[4] Ms. Paini disputes that she made the comment, but the Court views all facts in favor of the non-movant when resolving a summary judgment motion.

83 F.3d 833, 841-42 (7th Cir. 1996) ("subjective beliefs of the plaintiff are insufficient to create a genuine issue of material fact") (internal punctuation omitted).  Without more, these tenuously connected events suggest that Ms. Paini's comment is more properly considered a "stray work place remark[], rather than evidence of a thought process behind [the employee's] termination." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 788 (7th Cir. 2004) (quoting *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 576 (7th Cir. 2003)); *see also Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997) ("[derogatory] comments cannot defeat summary judgment in favor of an employer unless they are both proximate and related to the employment decision in question.").

Further, the Agency articulated non-discriminatory reasons for both of these assertions, which Ms. Atwell has not rebutted.  For instance, Ms. Paini's comments were made while she was explaining that the Agency had decided to extend Ms. Atwell's window for applying for long-term disability benefits.  In addition, the Agency explains that it required Ms. Atwell to log her work and meet with Mr. Smith because of productivity issues that were identified at her mid-year evaluation, four months before her termination.

In sum, because Ms. Atwell has failed to demonstrate sufficient facts to suggest a discriminatory motive for her termination, summary judgment is appropriate regarding this claim.

**D.**      **Retaliation Claim**

Ms. Atwell's third claim is that the Agency retaliated against her for requesting a reasonable accommodation.[5]  The ADA prohibits employers from retaliating against employees who assert their rights under the ADA.  42 U.S.C. § 12203(a); *Dickerson*, 657 F.3d at 601.  In addition, employers are forbidden from retaliating against employees who raise ADA claims

---

[5] In her response brief, Ms. Atwell indicates that she is no longer pursuing a retaliation claim on account of her E.E.O.C. discrimination charge.  (*See* Filing No. 65 at 34 n.2.)

regardless of whether the initial claims of discrimination are meritless. *Dickerson*, 657 F.3d at 601. A plaintiff can establish retaliation under the ADA through either the direct or indirect method of proof. *Preddie*, 799 F.3d at 814; *Dickerson*, 657 F.3d at 601. As with her discrimination claim, Ms. Atwell asserts a retaliation claim solely under the direct method.

Under the direct method, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Dickerson*, 657 F.3d at 601. The Agency does not dispute that Ms. Atwell's request for an accommodation was a protected activity or that Ms. Atwell suffered an adverse employment action when she was terminated as a forensic scientist. Rather, the Agency argues that it terminated Ms. Atwell's employment because she was not meeting the essential functions of a forensic scientist and not because Ms. Atwell requested an accommodation.

In this regard, Ms. Atwell has provided sufficient evidence to demonstrate a factual issue regarding the Agency's actual motivation. In October 2013, Ms. Atwell began fearing that she was going to lose her job because her concentration issues were affecting her productivity. When she informally asked her supervisor if she could work a partial load in the Trace Section to improve her productivity, Mr. McCurdy interpreted the request as "trying to dictate" where Ms. Atwell wanted to work and what kind of cases she would do. (Filing No. 66-22 at 25-28.) Soon thereafter, when Ms. Atwell made her formal request for an accommodation to Ms. Keller, Ms. Keller immediately decided to terminate Ms. Atwell's employment. (Filing No. 66-23 at 34-35.) Mr. Medler also came to the same immediate conclusion. (Filing No. 66-22 at 30-33.) Indeed, Mr. Medler explains his thought process as follows:

> I determined that [the Agency] had gone to great lengths to accommodate Atwell's marijuana allergy, great lengths to help Atwell succeed as a Serologist both before and after her training period, had exhausted all reasonable options to accommodate

both her marijuana allergy and claimed mental impairments, and there was nothing more that [the Agency] could do to retain Atwell as an employee.

(Filing No. 56-1 at 6; Filing No. 60 at 16.)

Although the Agency argues that it made the decision to terminate Ms. Atwell's employment based on her purported admission that she could not do her job, this quote by Mr. Medler potentially suggests that he and the Agency were, simply "fed up" with Ms. Atwell's accommodation requests and terminated her employment because of them. As a result, Ms. Atwell has demonstrated a factual issue regarding the actual motivation for her termination, thereby precluding summary judgment on her retaliation claim.

## IV. <u>CONCLUSION</u>

For the aforementioned reasons the Court **GRANTS in part** and **DENIES in part** the Agency's Motion for Summary Judgment (Filing No. 55). The Court **DISMISSES** Ms. Atwell's disability discrimination claim. However, Ms. Atwell's failure to accommodate and retaliation claims remain pending.

**SO ORDERED.**

Date:  3/2/2016

_Tanya Walton Pratt_
_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Christopher S. Stake
DELANEY & DELANEY LLC
cstake@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Lynne Denise Hammer
OFFICE OF CORPORATION COUNSEL
CITY OF INDIANAPOLIS
lynne.hammer@indy.gov

Pamela G. Schneeman
OFFICE OF CORPORATION COUNSEL
CITY OF INDIANAPOLIS
pamela.schneeman@indy.gov